1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9

PEDRO V. YBARRA and                           CASE NO. 1:11-CV-00288-SMS
MARY I. YBARRA,

10

                 Plaintiffs,

11

    v.                                                    ORDER GRANTING DEFENDANT'S
                                      MOTION FOR SUMMARY JUDGMENT

12

JOHN BEAN TECHNOLOGIES

13

CORPORATION; and
DOE 1 THROUGH DOE 100,

14

                 Defendants.                    (Doc. 29)

15

_____/

16

17

      Defendant John Bean Technologies Corporation ("JBT") moves for summary judgment

18

on Plaintiffs' first cause of action for negligence, contending that Plaintiff's negligence claim is

19

subject to and precluded by the exclusive remedy provision of California Labor Code §§ 3600

20

and 3602. Claiming that he is an independent contractor, Plaintiff[1] argues that the exclusive

21

remedy provision does not apply to him. Having reviewed the parties' briefs and applicable law,

22

this Court now grants Defendant's motion for summary judgment.

23

## I.    Undisputed Facts

24

      From 2007 through 2010, Plaintiff Pedro Ybarra worked as a temporary employee in

25

JBT's FoodTech facility in Madera, California, for periods of approximately nine months, 5

26

months, three months, and one week. Randstad North America, L.P., doing business as

27

28

_____

[1] Since Plaintiff Mary Ybarra's claim is limited to loss of consortium, references to "Plaintiff" will refer
solely to Plaintiff Pedro Ybarra.

1   Placement Pros, secured Plaintiff's positions pursuant to Temporary Services Agreements with

2   JBT.  A Temporary Services Agreement for the period of April 1, 2009 through November 2,

3   2010, was in effect on the date of the incident in which Plaintiff alleges that he was injured.

4   Plaintiff was working on JBT's premises when he was injured.

5       Placement Pros initially evaluated Plaintiff's skills.  Placement Pros agreed to "furnish to

6   placements the location and name of the person to whom to report," "direct the placements to

7   perform their duties under the supervision and control of JBT's designated supervisors," and

8   "direct placements to comply with all applicable rules, regulations, policies and procedures

9   including but not limited to fire protection, safety and security."  JBT paid Plaintiff's

10  compensation plus a fee to Placement Pros, which then calculated withholding amounts and

11  prepared Plaintiff's paycheck.

12      The agreement provided that JBT would "furnish a safe and appropriate place to work"

13  "provide all safety equipment and supplies with the exception of safety shoes," and "furnish

14  supervision, equipment, machinery, tools, materials and supplies necessary for the performance

15  of the work."  JBT took "full responsibility for the safety of its work, including supervision and

16  performance of all its employees engaged therein."  The agreement specified that Placement Pros

17  would obtain workers' compensation insurance to cover workers placed at JBT, with JBT named

18  as an additional insured.

19      If Plaintiff required any training, JBT provided it.  Plaintiff attended safety meetings with

20  regular JBT employees.  Like other JBT employees, Plaintiff sometimes used tools provided by

21  JBT and sometimes used his own tools.

22      At JBT, Plaintiff worked as a general laborer, which he described a being a general helper

23  who went where he was needed.  He was initially assigned to the machine shop to deburr

24  machine parts, and later worked in assembly and installation.  Plaintiff's work, helping assemble

25  JBT cookers, was part of JBT's regular business.  Various JBT employees assigned Plaintiff

26  work and directed his activities; other regular JBT employees could ask Plaintiff for help.

27  Plaintiff testified that JBT controlled and directed his activities while he worked there.

28  ///

1    Plaintiff testified that, in the pipe shop, he was primarily supervised by Mike, the lead

2    man, and George, Plaintiff's work buddy.  The lead man assigned work to Plaintiff and

3    determined whether Plaintiff would work on his assigned task or be pulled off to do another job.

4    Plaintiff reported to his work buddy, who confirmed Plaintiff's work and directed him to do it

5    over, if necessary.  Plaintiff testified that he received "less supervision" from Sergio, who he

6    described as "the actual person in the pipe shop."

7    **III.    Summary Judgment**

8       **A.    Applicable Law**

9    Summary judgment should be granted "if the pleadings, the discovery and disclosure

10   materials on file, and any affidavits show that there is no genuine issue as to any material fact and

11   that the movant is entitled to judgment as a matter of law."  F.R.Civ.P. 56(c)(2); *Adickes v. S.H.*

12   *Kress & Co.*, 398 U.S. 144, 157 (1970); *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d

13   1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of

14   establishing the basis of its motion and of identifying the portions of the declarations, pleadings,

15   and discovery that demonstrate absence of a genuine issue of material fact.  *Celotex Corp. v.*

16   *Catrett*, 477 U.S. 317, 323 (1986); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

17   Cir. 2007).  A fact is material if it could affect the outcome of the suit under applicable law.  *See*

18   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Thrifty Oil Co. v. Bank of*

19   *America Nat'l Trust & Savings Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003).  A dispute about a

20   material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

21   the non-moving party.  *Anderson*, 477 U.S. at 248; *Long v. County of Los Angeles*, 442 F.3d

22   1178, 1185 (9th Cir. 2006).

23   When the moving party will have the burden of proof on an issue at trial, it must

24   demonstrate that no reasonable trier of fact could find other than for the moving party.

25   *Soremekun*, 509 F.3d at 984.  When the non-moving party will have the burden of proof on an

26   issue at trial, the movant may prevail by presenting evidence that negates an essential element of

27   the non-moving party's claim or merely by pointing out that no evidence supports an essential

28   element of the non-moving party's claim.  *See Soremekun*, 509 F.3d at 984; *Nissan Fire and*

1   *Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party

2   fails to carry its burden of production, then "the non-moving party has no obligation to produce

3   anything, even if the non-moving party would have the ultimate burden of persuasion."  *Nissan*

4   *Fire & Marine*, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden

5   then shifts to the opposing party to establish that a genuine issue as to any material fact actually

6   exists.  *Id.* at 1103.  The opposing party cannot "'rest upon the mere allegations or

7   denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing

8   that there is a genuine issue for trial.'"  *Estate of Tucker v. Interscope Records*, 515 F.3d 1019,

9   1030 (9th Cir.) *(quoting* F.R.Civ.P. 56(e)), *cert. denied*, 129 S.Ct. 174 (2008).

10          The evidence of the opposing party must be believed, and all reasonable inferences that

11   may be drawn from the facts placed before the court must be drawn in favor of the opposing

12   party.  *See Anderson*, 477 U.S. at 255; *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*

13   *Corp.*, 475 U.S. 574, 587 (1986); *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1065 (9th

14   Cir. 2003).  Nonetheless, inferences are not drawn out of the air, and it is the opposing party's

15   obligation to produce a factual predicate from which the inference may be drawn.  *See Sanders v.*

16   *City of Fresno*, 551 F.Supp.2d 1149, 1163 (E.D.Cal. 2008), *affirmed*, 340 Fed.Appx. 377 (9th

17   Cir. 2009); *UMG Recordings, Inc. v. Sinnott*, 300 F.Supp.2d 993, 997 (E.D.Cal. 2004).  "A

18   genuine issue of material fact does not spring into being simply because a litigant claims that one

19   exists or promises to produce admissible evidence at trial."  *del Carmen Guadalupe v. Negron*

20   *Agosto*, 299 F.3d 15, 23 (1st Cir. 2002).  A court has the discretion in appropriate circumstances

21   to consider materials that are not properly brought to its attention, even though a court is not

22   required to examine the entire file for evidence establishing a genuine issue of material fact when

23   the opposing party has not set forth the evidence with adequate references.  *See Southern*

24   *California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003); *Carmen v. San*

25   *Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party

26   fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is

27   entitled to summary judgment.  *See Nissan Fire & Marine*, 210 F.3d at 1103.

28   ///

**B.     Is Workers' Compensation the Exclusive Remedy Available to Plaintiff?**

"Workers' compensation provides the exclusive remedy against an employer for an injury sustained by an employee in the course of employment and compensable under the workers' compensation code." *Angelotti v. Walt Disney Co.*, 192 Cal.App.4th 1394, 1403 (2011).  *See* Cal. Labor Code §§ 3600 and 3602. This means that an injured employee may not bring a tort action against the employer if the conditions for workers' compensation are present. *Id.*  The exclusivity rule is based in the "presumed compensation bargain in which the employer assumes liability for injury or death arising out of and in the course of employment without regard to fault and compensation is relatively swift, in exchange for limitations on the amount of liability." *Id., quoting Shoemaker v. Myers*, 52 Cal.3d 1, 16 (1990) (*internal quotations omitted*).  The workers' compensation code must be liberally construed to extended benefits to all persons injured in their employment.  Cal. Labor Code § 3202.

**1.     Who is a Special Employee?**

Under California's workers' compensation code, an employee is "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed . . . . ." Cal. Labor Code § 3351.   An individual rendering service to another is presumed to be an employee for workers' compensation purposes unless he or she is an independent contractor or is otherwise expressly excluded by the workers' compensation code.  Cal. Labor Code §§ 3351 and 3357.

"An employee may have two employers for purposes of workers' compensation." *Angelotti*, 192 Cal.App.4th at 1403.  When an employer sends an employee to perform work for another person or entity, and both have certain powers of control over the employee's work, the employee is said to have an original or general employer and a special employer. *Kowalski v. Shell Oil Co.*, 23 Cal.3d 168, 174 (1979).  Both employers must provide workers' compensation benefits, and both are protected by the exclusivity rule. *Id.* at 175.  *See also Caso v. Nimrod Productions, Inc.*, 163 Cal.App.4th 881, 888 (2008).

California courts that have evaluated the status of individuals injured while working as temporary or leased employees have generally found such persons to be special employees, not

independent contractors. *See, e.g., Angelotti*, 192 Cal.App.4th at 1406 ("In our view, the typical use of a loan-out company in the hiring of talent in the entertainment industry does not mitigate the right of control or the other factors indicating the existence of an employment relationship.") To evaluate a worker's status as employee or independent contractor, a court must consider the nature of the work and the parties' overall arrangements in view of the protective purposes of workers' compensation law. *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341, 353 (1989). Individual aspects of the arrangement cannot be considered mechanically or in isolation since each must be weighed with regard to its interrelationship with the other factors. *Id.* at 351. A court's analysis must recognize the policy differences between common law distinctions between employers and independent contractors, which sought to define an employer's liability for injuries caused by his employee, and distinctions for purposes of the workers' compensation law, which addresses when an employer should insure injuries to his employees. *Borello*, 48 Cal.3d at 352.

### a.     Primary Factor: Control

"The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the desired result." *Angelotti*, 192 Cal.App.4th at 1404. *See also Kowalski*, 23 Cal.3d at 176. This distinction arose at common law to limit an employer's vicarious liability for the misconduct of those who rendered services to him. *Borello*, 48 Cal. 3d at 350. The employer's supervisory power became a crucial factor since the extent of its right to control the worker's actions was highly relevant to the determination of whether or not the employer ought to be liable for the results of those actions. *Id., quoting* 1C Larson, *The Law of Workers' Compensation*, § 43.42 at 8-20 (1986). In workers' compensation law, the degree of the employer's control over the worker remains the decisive test of employee status.

### b.     Secondary Factor: Right to Discharge

Despite the primacy of the employer's right to control the worker, courts have long found that the control test alone is insufficient to sort out the many variations in working arrangements. A strong secondary factor supporting the finding of an employment relationship is the employer's

right to discharge at will without cause. *Borello*, 48 Cal.3d at 350. Some California courts have questioned the weight given to this factor, however.

> [T]hat an alleged special employer can have an employee removed from the job site does not necessarily indicate the existence of a special employment relationship. Anyone who has the employees of an independent contractor working in his premises could, if dissatisfied with an employee, have the employee removed. Yet, the ability to do so would not make the employees of the independent contractor the special employees of the party receiving the services.

*Kowalski*, 23 Cal.3d at 177 n. 9.

### c.    Other Secondary Factors

Additional secondary factors are drawn from the Restatement Second of Agency, § 220. *Borello*, 48 Cal.3d at 351. These factors include whether the worker is engaged in a distinct occupation or business; whether the work is usually done by a specialist without supervision; whether the work requires a specific skill; whether the employer or the worker supplies the instrumentalities, tools, and work place; whether the worker can profit or loss depending on his or her managerial skill; the duration of the work; whether the worker is paid for the time or the job; whether the work is part of the principal's regular business; and whether the parties think they are creating an employment relationship. *Angelotti*, 192 Cal.App.4th at 1404. Certain factors tend to negate the existence of a special employment relationship: "the worker is skilled and has substantial control over operational details, the worker is not engaged in the borrower's usual business, the worker works only for a brief period of time, does not use the tools or equipment of the borrowing employer but uses his own tools or the tools of the lending employer and the borrower employer neither pays the worker nor has the right to discharge him." *Riley v. Southwest Marine, Inc.*, 203 Cal.App.3d 1242, 1250 (1988).

### d.    Analyses in Prior Cases

For example, Angelotti, a movie stuntman, was injured while rehearsing a stunt for a movie production company called Second Mate. *Angelotti*, 192 Cal.App. 4th at 1400. Second

Mate secured Angelotti's services through his "loan-out company,"[2] Skidaddle. *Id.* at 1399.

Angelotti executed an "inducement" acknowledging that Second Mate was his special employer

and that any claims falling within the scope of workers' compensation would be governed by

workers' compensation law. *Id.* at 1399.  Second Mate contracted with a third company, Cast &

Crew, to provide payroll services. *Id.* at 1399.  As part of its contract with Second Mate, Cast &

Crew agreed to serve as employer of record and to obtain workers' compensation insurance

naming Second Mate as an additional insured. *Id.* at 1399.  After he was injured, Angelotti

collected workers' compensation benefits from Cast & Crew, then sued Second Mate and several

other persons and entities associated with the film for negligence. *Id.* at 1398.  The California

Appellate Court concluded that because Angelotti was an employee of Second Mate, the

exclusivity rule barred his negligence action against it. *Id.* at 1405-06.

In its analysis, the court found compelling, but not conclusive, evidence of an

employment relationship in Second Mate's right to control the method and manner of Angelotti's

work through its stunt coordinator's determination of Angelotti's daily work schedule and tasks.

*Id.* at 1405.  It found Second Mate's employment of Angelotti through week-long contracts with

Skidaddle, which Second Mate was not compelled to renew, to be tantamount to a right to

discharge at will. *Id.*  With regard to the other secondary factors the court found that despite the

particular skills required of a stunt man, Angelotti had no substantial control over the operational

details of his work, which was directed by the stunt coordinator; although Angelotti used some of

his own equipment, Second Mate provided the workplace and all essential equipment; Angelotti

was paid a set weekly wage with no opportunity for profit or loss based on his managerial

expertise; Second Mate paid Angelotti for his time not by the job; the seven-month duration of

---

[2]  The use of a loan-out company is apparently a common practice in the entertainment industry.  "When an individual is hired by a producer to work on a production, the individual informs the producer that he or she has a loan-out corporation.  Then, three-way contracts are entered into in which the loan-out corporation agrees to furnish the services of its owner and sole employee to the producer; the producer agrees to pay the loan-out corporation for the owner/employee's services; and the owner/employee agrees to the arrangement.  The loan-out company itself does not participate in any way in the production after the loan-out agreement is signed except to receive payment for its owner/employee's services."  *See Caso*, 163 Cal.App.4th at 316-17 (*footnote omitted).*

the work was substantial; film production, including the stunts, was part of Second Mate's

regular business as a film producer; and finally, Angelotti himself signed the inducement

acknowledging the creation of an employment relationship between him and Second Mate.  *Id.*

A California appellate court also found a temporary worker to be a special employee in

*Wedeck v. Unocal Corp.,* 59 Cal.App.4th 848 (1997).  In May 1992, Wedeck, who had a

Bachelor of Science degree in Chemistry, began working for Lab Support, an agency that placed

temporary employees in companies requiring technical workers.  *Id.* at 852.  In August 1992, Lab

Support assigned Wedeck to work as a full-time chemist at the defendant's refinery.  *Id.*  Unocal

paid Lab Support for Wedeck's services on an hourly basis, and Lab Support paid Wedeck based

on the time reports that she submitted to it.  *Id.* at 853.  Unocal initially trained Wedeck and

provided her with procedural manual to which she periodically referred as she performed her

work.  *Id.*  Unocal provided equipment and tools needed for the work as well as all necessary

safety equipment.  *Id.*  It periodically provided Wedeck with a schedule of specific chemical

testing and analysis to be performed within a designated period.  *Id.*  Wedeck was required to

perform weekly quality assurance tests which were periodically reviewed by her Unocal

supervisor.  *Id.*  After Wedeck sustained personal injuries attributable to the chemicals to which

she had been exposed at Unocal, she filed suit against it.  *Id.* at 854.  Unocal asserted that

Wedeck's complaint was barred by the exclusive remedy provision.  *Id.*

The court rejected Wedeck's claims that her self-supervision and technical expertise

rendered her an independent contractor.  No matter how brief Unocal's training was, said the

court, neither party disputed that Wedeck was expected to carry out her duties in accordance with

that training and without constant supervision.  Unocal supervisors assigned her work and

performed regular reviews of her quality assurance tests.  "That she performed her job without

constant intervention by supervisors [did] not negate the undisputed fact that she was subject to

Unocal's control and direction."  *Id.* at 859.  The relevant factor was not that the employer

exercised control but that the employer had the right to direct the details of the work.  *Id.*

///

The majority of the secondary factors also supported a conclusion that Wedeck was an employee:

> Wedeck performed Unocal's work at Unocal's job site using, with minimal exceptions, Unocal's tools and equipment;  Lab Support and Unocal agreed that Wedeck would be wholly trained and supervised by Unocal;  Wedeck accepted the assignment with Unocal and acquiesced in all of the conditions of work in Unocal's Chemical Laboratory; Unocal paid Lab Support an hourly rate for Wedeck's work, and Lab Support paid her; and she worked at the laboratory for nearly one year.

*Id.* at 861.

Wedeck and Unocal disagreed about Unocal's right to fire Wedeck.  Wedeck's supervisor at Unocal believed he had authority to terminate her; Wedeck understood that Unocal would have had to inform Lab Support, which would have informed her not to return to Unocal.  *Id.* The court concluded that, although the power to discharge an employee is a factor for consideration, the dispute was not sufficient to preclude a grant of summary judgment.  *Id.* at 862.  "Despite retaining the right to terminate the special employment relationship, the ability of a special employer to discharge the employee from his or her *general* employment would be unusual indeed, particularly in the labor broker context."  *Id.*

In *Riley*, 203 Cal.App.3d at 1246, after the plaintiff signed up with labor broker Manpower, Inc., Manpower sent Riley to work as a general laborer for the defendant, Southwest Marine.  While Riley worked at Southwest Marine, Manpower's sole role was to review his time records, calculate his pay and necessary deductions for taxes, insurance, and similar expenses, then issue his paycheck.  *Id.*  Southwest Marine trained Riley, provided safety equipment and tools, gave daily job instructions, and supervised his work.  *Id.*  In the course of his work at Southwest Marine, Riley was injured.  *Id.* at 1246-47.  After receiving workers' compensation benefits, Riley sued Southwest Marine.  *Id.* at 1247.  After the trial court granted Southwest Marine summary judgment, Riley appealed, contending that summary judgment was improper since the employment relationship question was a question reserved for the trier of fact.  *Id.*  The appellate court disagreed, finding that when neither the evidence nor inferences are in conflict, the question of employment relationship is properly determined as a matter of law.  *Id.* at 1248.

The appellate court held that summary judgment was appropriate, noting that the facts "unequivocally establish[ed]" a special employment relationship as a matter of law:

> Riley's own deposition testimony establishes that he specifically agreed to the Southwest Marine assignment. He was an unskilled general laborer who was working exclusively at Southwest Marine's job site. Southwest Marine personnel trained Riley, provided daily job instructions and supervised his work. Southwest Marine provided all safety equipment and work tools. Riley worked for Southwest more than briefly; he had been on the job for more than seven months at the time of his injury. Riley believed Southwest Marine had the power to discharge him. In sum Southwest Marine had the right to control and direct Riley's activities and the manner in which he performed the work; Southwest Marine did not merely make suggestions of details or cooperation.

*Id.* at 1250.

In addition, the court rejected Riley's claim that it should not extend the borrowed servant doctrine rule to a labor brokerage situation, pointing out that, based extensive national case law, applying the rule was well-established in that situation. *Id.* at 1251-52.

In contrast, when a worker was injured while employed by a company performing maintenance work at the defendant's refinery, the California Supreme Court held that the trial court erred in entering a judgment notwithstanding the verdict in favor of the defendant when substantial evidence supported the jury's finding that the injured worker was not the defendant's special employee. *Kowalski*, 23 Cal.3d at 171.

Peterson and Shell entered into an agreement for Peterson to perform the required maintenance work. *Id.* The purchase order provided, in part, that: "It is Shell's intent to establish a 'general and special employment relationship' whereby the contractor (Peterson) remains the general employer of its employees and Shell becomes their special employer." *Id.* Modifications to the that "Shell, as special employer, hereby is given the right to fully control the details and means of doing the work hereby contracted for." *Id.* at 172. During the course of the maintenance, while Kowalski was operating a radial saw provided by Shell, Kowalski's hand was amputated. *Id.*

The evidence presented at trial showed that Shell regularly used Peterson to perform its periodic maintenance work, which was performed in areas of the refinery shut down for that

purpose. *Id.* at 173.  Prior to the work's beginning, Shell prepared detailed lists of tasks for

Peterson to perform in the area to be shut down and maintained, which it distributed to its

foremen, who in turn provided the information to Peterson's foremen.  *Id.*  As the maintenance

work proceeded, the Shell foremen could stop any Peterson employee doing something of which

Shell disapproved and redirect their work.  *Id.*  Shell could also request Peterson to remove any

employee whose work did not satisfy Shell. *Id.*

Nonetheless, all Peterson employees were directly supervised by Peterson foremen.  *Id.*

Peterson provided its employees with tools and equipment, and hard hats and badges with

Peterson's logo.  *Id.*  The saw which injured Kowalski was the only tool provided by Shell.  *Id.*

Peterson employees could enter through only one of the many entrances available to Shell

employees.  *Id.*  Kowalski, who was assigned to Peterson's carpentry crew, was on Peterson's

payroll and directly supervised by Peterson's carpentry foreman.  *Id.*  According to the carpentry

foreman for both Shell and Peterson, Shells' direction was limited to informing Peterson of the

location and necessary size of scaffolds and occasionally responding to questions from Peterson's

carpenters.  *Id.* at 173-74.  No Shell employee directed the details of Kowalski's work.  *Id.* at

174.

Noting that the contract was not conclusive evidence of a right to control, the Court

emphasized the primary factor in finding special employment was whether the alleged special

employer exercised control over the details of the injured worker's work.  *Id.* at 176.  Shell

exercised no control over Kowalski's work; only Peterson's carpentry foreman directed

Kowalski.  Kowalski was paid by Peterson and had worked for it elsewhere at other times.

Peterson provided tools and safety equipment, with the exception of the saw.  Although Shell

could have asked Peterson to remove Kowalski from the job for unsatisfactory work, Shell could

not fire Kowalski.  Accordingly, substantial evidence supported the jury's finding that Kowalski

was not Shell's special employee.

Just as Shell's purchase order failed in its attempt to define the employees of its

independent contractor as its special employees, labeling a worker an independent contractor

does not magically transform him or her into an independent contractor.  In *Borello*, a cucumber grower sought to characterize its harvesters, which it called "sharefarmers," as independent contractors, arguing that they managed their own labor, shared the profit or loss from the crop, and agreed in writing that they were not employees.  48 Cal.3d at 345.  The California Supreme Court rejected the grower's arguments finding that the grower controlled all of the agricultural operations from the crop's planting to its sale.  *Id.*  Even though the grower elected to accomplish harvest, a single step in an integrated process, by using worker incentives rather than direct supervision, the court concluded that the grower retained "all necessary control over a job which can only be done only one way."  *Id.*  The sharefarmers' work followed the usual patterns of a seasonal employee.  *Id.*  "In no practical sense," said the court, "[were] the 'sharefarmers' entrepreneurs operating businesses for their own accounts."  *Id.*  Instead, the court concluded that the harvesters were obviously members of the broad class of employees to which workers' compensation law applied.  *Id.*

The Court emphasized that the distinction between employee and independent contractor could not be resolved without consideration of the history and remedial statutory purposes underlying the workers' compensation law, including the class of persons intended to be protected and the parties' relative bargaining positions.  *Id.* at 352-53; *see also numerous cases identified therein*.

> The purposes of the Act are several.  It seeks (1) to ensure that the cost of industrial injuries will be part of the cost of goods rather than a burden on society, (2) to guarantee prompt, limited compensation for an employee's work injuries, regardless of fault, as an inevitable cost of production, (3) to spur increased industrial safety, and (4) in return, to insulate the employer from tort liability for his employees' injuries. (See *Laeng [v. Workmen's Comp. Appeals Bd.*, 6 Cal.3d 771, 782 (1972)]; *Van Horn v. Industrial Acc. Com.* (1963) 219 Cal.App.2d 457, 467 [33Cal.Rptr. 169]; 2 Hanna [Cal. Law of Employee Injuries and Workmen's Compensation, (2d ed. 1988)], § 1.05 [1], [2], pp. 1-25 to 1-27.

*Borello*, 48 Cal. 3d at 354.

The Act accomplishes its goal of comprehensive coverage of employment injuries by generally defining employment to include all those in service to an employer and by presuming that any person serving an employer is a covered employee.  *Id.*; California Labor Code § 2750.5.

By expressly including an exception for independent contractors, the Act seeks to impose the risk of no-fault injuries directly on the provider of compensated service "when the provider of service has the primary power over work safety, is best situated to distribute the risk and cost of injury as an expense of his own business, and has independently chosen the burdens and benefits of self-employment. *Id.* Unlike a special employee, a true independent contractor is in a position to insure him- or herself against accidents occurring in the course of work. *Id.*

## 2. <u>Who is an Independent Contractor?</u>

Seeking to bring a tort action against Defendant, Plaintiff claims that he was an independent contractor, not an employee. "[A]ny person who renders service for a specified recompense for a specified result, under control of his principal as to the result of his work only and not as a means by which such result is accomplished" is an independent contractor. Cal. Labor Code § 3353.

Factors favoring a determination that the worker is an independent contractor include not only the worker's right to control his or her own work but "(1) the alleged employee's opportunity for profit and loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business." *Id.* at 354-55. Other factors include those set forth in California Labor Code § 2750.5, which provides that contractors are presumed to be employees unless proof establishes

> (a) That the individual has the right to control and discretion as to the manner of performance of the contract for services in that the result of the work and not the means by which it is accomplished is the primary factor bargained for.
>
> (b)  That the individual is customarily engaged in an independently established business.
>
> (c) That the individual's independent contractor status is bona fide and not a subterfuge to avoid employee status.  A bona fide independent contractor status is further evidenced by the presence of cumulative factors such as substantial investment other than personal services in the business, holding out to be in business for oneself, bargaining for a contract to complete a specific project for

-14-

1    compensation by project rather than by time, control over time and place the work
     is performed, supplying the tools or instrumentalities used in the work other than
2    tools and instrumentalities normally and customarily provided by employees,
     hiring employees, performing work that is not ordinarily in the course of the
3    principal's work, performing work that requires a particular skill, holding a
     license pursuant to the Business and Professions Code, the intent by the parties
4    that the work relationship is of an independent contractor status, or that the
     relationship is not severable or terminable at will by the principal but gives rise to
5    an action for breach of contract.

6        The statute also requires that when an individual is performing a function or activity for

7    which a license is required by Chapter 9 of Division 3 of the Business and Professions Code, the

8    individual must hold a valid license to be considered an independent contractor.  California

9    Labor Code § 2750.5.

10                              **a.    Analysis in Prior Cases**

11       Determining that the sharefarmers in *Borello* were not independent contractors, the

12   California Supreme Court observed that similar cases elsewhere generally did not consider

13   harvesters to be independent contractors, noting that "the workers made no capital investment

14   beyond simple hand tools; they performed manual labor requiring no special skill; their

15   remuneration did not depend ion their initiative, judgment or managerial abilities; their service,

16   though seasonal, was rendered regularly and as an integrated part of the grower's business; and

17   they were dependent for subsistence on whatever farm work they could obtain."  48 Cal.3d at

18   355.

19       The importance of careful analysis in determining whether a worker is a special employee

20   or an independent contractor is well illustrated by *Marsh v. Tilley Steel Co.*, 26 Cal.3d 486

21   (1980).  Plaintiff Marsh was a truck driver for Maxwell Construction, the general contractor in

22   the construction of a freeway.  *Id.* at 490.  Defendant Tilley Steel was a subcontractor responsible

23   for installing reinforced steel in Maxwell's concrete work.  *Id.*  Wynglarz, a skilled crane

24   operator, worked for Tilley Steel.  *Id.*  To efficiently complete the project, Maxwell and Tilley

25   Steel closely coordinated supplies and labor.  *Id.* at 491.  In the course of construction, the

26   superintendents of the two companies agreed that when one company needed to use a specific

27   type of crane but did not have one available, it would temporarily borrow the necessary crane and

28

operator from the other company.  *Id.*  Neither party would compensate the other if it became

necessary to borrow a crane; any borrowed worker would continue to report to his own

supervisor and would not be administratively shifted to the other company; borrowed personnel

would remain on the payrolls  of their regular employers; and the borrowed equipment would

retain the insignia and remain wholly the property of its owner.  *Id.*

The Court explained:

> The informal agreement did not specify the degree of control to be exercised by
> the employer, either general or special, over a borrowed crane operator's work.  It
> was apparently understood by the parties, however, that the borrowing employer
> would advise the operator of the particular work results to be achieved, but, as is
> common in such cases, the specific details of positioning and controlling the crane
> were left to the judgment of the skilled operator.  By custom, an operator often
> relies on informational hand signals from nearby workers in order to make the
> necessary decisions regarding an operation of the crane and safety may require
> such signals.

*Id.* at 491.

On the afternoon of the incident in which Marsh was injured, Wynglarz's supervisor

directed Wynglarz to take his crane to Maxwell's work site to assist in moving equipment,

including concrete forms, each of which weighed 1400 pounds.  *Id.*  After Wynglarz had loaded

the concrete forms onto Marsh's truck, Marsh drove them to their destination and Wynglarz

positioned the crane and boom to unload them.  *Id.*  Marsh attached the forms to the boom and

jumped to the ground to signal their placement.  *Id.*  Before Marsh could signal, however, the

forms broke free of the boom.  *Id.*  Marsh was struck and severely injured.  *Id.* at 492.

In Marsh's ensuing negligence action against Tilley Steel, the trial judge granted Tilley

Steel's motion for a nonsuit, holding that because Maxwell exercised control over Wynglarz,

Wynglarz had become a special employee of Maxwell.  *Id.*  As a result, said the trial court,

Marsh was limited to his workers' compensation remedy.  *Id.*  The California Supreme Court

reversed.  Reciting the factors relevant to determining a tortfeasor's employment status, the court

observed, "[W]here the servants of two employers are jointly engaged in a project of mutual

interest, each employee ordinarily remains the servant of his own master and does not thereby

become the special employee of the other." *Id.* at 493.

### 3.   <u>Analysis of Facts in This Case</u>

When the undisputed facts of this case are evaluated pursuant to workers' compensation law and the cases decided under it, Plaintiff's situation looks more like *Angelotti*, *Borello, Caso*, and *Wedeck*, and less like *Kowalski* and *Marsh*.

First, there is no question regarding the principal factor, JBT's right to control Plaintiff's work.  The Temporary Services Agreement between JBT and Placement Pros required Placement Pros to furnish "contingent staff" for "temporary placements" in various job positions at JBT.  It provided that JBT would "furnish supervision" and "provide job specific training," and that Placement Pros would "direct placements to perform their duties under the supervision and control of JBT's designated supervisors."  In addition, as specified in the undisputed facts, JBT had "full responsibility for the safety of its work, including supervision and performance of all its employees engaged therein."

The agreement contemplated that Placement Pros would act as a labor broker, providing appropriate temporary employees for JBT, administering their payroll, and securing workers' compensation insurance covering both Placement Pros and JBT.  Placement Pro's role here was akin to Lab Support's role in *Wedeck* and Manpower's role in *Riley*, and combined both the "loan-out" function of Skidaddle and the payroll services function of Cast & Crew in *Angelotti*.

Like Second Mate, Unocal, and Southwest Marine, Defendant supervised Plaintiff to the extent necessary to enable him to perform his work as a general laborer.  Defendant's supervision included daily meetings, supervision by management and the lead man, and immediate supervision and evaluation by his work buddy.  In his deposition, Plaintiff himself testified that JBT controlled and directed his work activities.

Plaintiff contends that because "[t]ypically [JBT] only spoke with Ybarra for approximately five to seven minutes regarding job assignments and then left Ybarra to do his work for the day," JBT did not supervise him sufficiently to create a special employee relationship.  This Court disagrees.  Just as in *Wedeck*, neither party here disputes that Plaintiff was expected to carry out his duties in accordance with the training and direction that JBT

provided to him.  Plaintiff's ability to perform his job without constant supervisor intervention did not mean that he was not subject to JBT's control and direction.  *See Wedeck*, 59 Cal.App.4th at 859.  The relevant factor was JBT's right to control and direct the details of Plaintiff's work. *Id.*  Further, at JBT, Plaintiff was regularly supervised by his work buddy, who inspected Plaintiff's work and either confirmed it or directed Plaintiff to do it over.

Plaintiff also contends that because JBT voided the agreement's terms by unilaterally changing the terms of his employment by involving him in the valve testing procedure that led to his injury, it cannot be said to have supervised him.  He relies on the language of Paragraph 8.A.vii. of the agreement:

"8.  Standards of Performance

A.  JBT shall, at its expense:

* * * * *

vii.  Agrees that Supplier [Placement Pros] is placing each Temp Employee for a specific job and set of duties.  JBT shall not change the job or duties of any Temp Employee without first giving Supplier prior written notice in order for Supplier prior written notice in order for Supplier to confirm whether such Temp Employee has the necessary skills for such new job or duties.  In any event, JBT shall not change the job or duties of a Temp Employee if Supplier, in its sole discretion, objects to such a change.

Plaintiff supports his position with statements from JBT supervisor Loren van Laar that Plaintiff was assigned to the assembly installation department and not to the valve test room, and that temporary workers did not work in the valve test room.  Contending that valve testing was a dangerous task that only certain qualified persons could perform, Plaintiff argues that JBT employee Jerry Anaya requested Plaintiff's assistance in the valve testing room without supervisor approval and without a supervisor's presence.  Plaintiff himself testified that, as a general laborer, he was frequently asked to assist JBT's regular employees with various tasks that required a helper.  Despite inflammatory language emphasizing the danger of the valve testing process, Plaintiff never explains why Anaya's request for assistance was sufficiently different from other JBT employee's requests for brief assistance to have merited notice to Placement

-18-

Pros. Nor does Plaintiff explain why, assuming Anaya's request in fact constituted a change in Plaintiff's job or duties that did not comply with the contract between JBT and Placement Pros, Anaya's contract violation obviated JBT's continuing supervision of Plaintiff. Although the agreement's terms are relevant to the question of JBT's right to control Plaintiff's work, the alleged breach of JBT's agreement with Performance Pros is irrelevant to the analysis of Plaintiff's status under the workers' compensation law. Plaintiff's assertion that Defendant did not control his work because it breached a provision of its contract with Placement Pros is illogical. Further, Plaintiff's argument confuses the concept of JBT's adherence to the agreement with an allegation that Anaya was negligent in requesting Plaintiff's assistance in testing the valve. If Plaintiff was a special employee under the workers' compensation act, Anaya's negligence is immaterial.

Finally, the argument is contradictory to Plaintiff's contention (discussed *infra*) that he was an independent contractor retained to perform a specific task, not a special employee. The undisputed facts indicate that Defendant had the right to supervise and control Plaintiff's work and that Defendant actually did supervise and control Plaintiff's work,

The parties dispute whether Defendant had the right to discharge Plaintiff at will without cause. Although the Agreement specified that Placement Pros were responsible for all decisions concerning hiring and firing, among other things, "JBT [could] terminate any assignment at its discretion and in accordance with applicable labor law." ¶ 8 B. vii. In addition, the Agreement required Placement Pros to "[r]emove placements from assignments for any lawful reason at JBT request and replace the individual as required by JBT within 24 hours." ¶ 8 B. vi. As in *Wedeck*, this Court acknowledges that an agreement to permit a special employer to discharge a special employee from his or her general employment would be highly unusual and finds the parties' dispute insufficient to preclude a grant of summary judgment. *See* 59 Cal.App.4th at 862.

The remaining secondary factors support a finding that Plaintiff was Defendant's special employee. Plaintiff was not engaged in a distinct occupation or business but worked as a general laborer assisting Defendant's regular employees as needed; general laborers need not possess any

special skill; general labor is not typically done by a specialist without supervision; with the exception of safety shoes, Defendant provided the instrumentalities, tools, and work place; Plaintiff was paid on an hourly basis without an opportunity to increase or decrease remuneration by means of his managerial skills; Plaintiff worked for Defendant for limited time periods, when Defendant's work load required additional laborers; Plaintiff was paid hourly; Plaintiff's work for Defendant was part of Defendant's regular business.  Although the record does not include any documentation by which Plaintiff acknowledged his status as a special employee, the Agreement between Placement Pros and Defendant contemplated special employment status in that it provided for Placement Pros' securing workers' compensation insurance covering both Placement Pros and Defendant.  Although Defendant did not prepare Plaintiff's paychecks, it paid the amount due for Plaintiff's labor to Placement Pros, to which it had delegated payroll responsibilities.

In contrast, Plaintiff does not satisfy the criteria of an independent contractor.  Applying the factors outlined in *Borello*, which look for factors opposite those indicating a special employee, indicates that Plaintiff did not serve Defendant as an independent contractor.  Plaintiff had no opportunity for profit or loss based on his managerial skill; he had no investment in equipment or materials to perform his task and did not employ other workers; his job responsibilities did not require a special skill; although his work for Defendant was temporary, it was an integral part of Defendant's regular business.

As previously discussed, California Labor Code § 2750.5 creates a presumption that a worker is a special employee unless (1) he or she has the right of control and discretion in the performance of the contract since the result of the work and not the means of accomplishment; (2) the worker is customarily engaged in an independently established business, and (3) the independent contractor status is bona fide and not a subterfuge to avoid employee status. Plaintiff cannot overcome the statutory presumption.  Defendant hired Plaintiff to provide labor on an hourly basis, not to accomplish a specific result; Plaintiff did not maintain an

///

independently established business, but worked as hourly labor at whatever business Placement

Pros sent him.

The question of subterfuge is usually raised in cases such as *Borello*, in which an

employer seeks to circumvent one or more requirements of labor or tax laws.  The circumstances

here suggest that Plaintiff seeks to circumvent the exclusive remedy provision of the workers'

compensation law.  As Defendant observed, Plaintiff did not begin to describe himself as an

independent contractor until he amended his complaint.

Plaintiff's attempt to establish himself as an independent contractor based on language in

the Temporary Services Agreement is not persuasive.  That language explicitly refers to the

relationship between Placement Pros and Defendant, and is specifically intended to preclude

Placement Pro's holding itself out as somehow related to Defendant in the course of its labor

recruitment activities.  The Agreement includes no language that in any way suggests that

individual workers that Placement Pros placed with Defendant were to be considered

independent contractors.

Finding Plaintiff's status to have been that of a special employee is consistent with the

policy underlying California's worker's compensation law.  As was the case with the

sharefarmers in *Borello*, Plaintiff's work was intended to assist JBT at crucial points in its

production cycles.  Assisting JBT's permanent employees is not the type of employment for

which the worker would be expected to provide his own insurance coverage, assuming that such

coverage would even be available to a temporary general laborer, who is neither highly skilled

nor extensively trained or educated to perform his job responsibilities.  To the contrary, the facts

support the conclusion that Plaintiff is precisely the type of worker that workers' compensation

laws are intended to protect.

Although the trier of fact must generally determine the existence of an employment

relationship, the court may determine the issue as a matter of law when the evidence supports

only a single conclusion.  *Borello*, 48 Cal.3d at 349; *Wedeck*, 59 Cal. at 857.  When the facts of

this case are evaluated in light of the applicable statutes and case law, the only possible

conclusion is that Plaintiff was Defendant's special employee.  Accordingly, Plaintiff's lawsuit is barred under the exclusive remedy provision of California's workers' compensation law.

### C.   Consortium Claim

"Although the cause of action for loss of consortium is not merely derivative or collateral to the spouse's cause of action, it is based on the physical injury or disability of the spouse and is precluded by the broad language of the Labor Code sections." *Cole v. Fair Oaks Fire Protection District*, 43 Cal.3d 148, 162-63 (1987).  When the employee's action for physical or mental injury is barred by the exclusivity rule, the related consortium claim is also barred.  *Id.*

### III.   Conclusion and Order

This Court hereby ORDERS that

1.      Defendant's motion for summary judgment is GRANTED;

2.      Plaintiffs' claims of negligence and loss of consortium are barred by the exclusivity rule ( Cal. Labor Code §§ 3600 and 3602; and

3.      The Clerk of Court is directed to enter judgment for Defendant.


IT IS SO ORDERED.

**Dated:   February 13, 2012**            **/s/ Sandra M. Snyder**
                                    UNITED STATES MAGISTRATE JUDGE